Filed 11/27/17 (this opn. precedes companion case S227270 also filed 11/27/17)

# IN THE SUPREME COURT OF CALIFORNIA

GERAWAN FARMING, INC., )
)  S227243
Petitioner, )
)  Ct.App. 5 F068526/F068676
v. )
)
AGRICULTURAL LABOR RELATIONS )
BOARD, )
)
Respondent; )
)
UNITED FARM WORKERS OF )
AMERICA, )
)
Real Party in Interest. )
)

In 1975, the Legislature enacted the Agricultural Labor Relations Act (ALRA) "to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, to negotiate the terms and conditions of their employment, and to be free from the interference, restraint, or coercion of employers of labor." (Lab. Code, § 1140.2; all statutory references are to this code unless otherwise specified.) The ALRA established an elaborate framework governing the right of agricultural workers to organize themselves into unions to engage in collective bargaining with their employers. (*Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 398 (*ALRB I*); see § 1140 et seq.) It also created the Agricultural Labor Relations Board (ALRB or the Board) and granted it "specific powers and responsibilities of administration, particularly in conducting and

1

certifying elections and in investigating and preventing unfair labor practices." (*ALRB I*, at p. 399.)

Twenty-five years later, the Legislature determined that additional legislation was necessary to fulfill the goals of the ALRA because it had proven ineffective at facilitating the negotiation and completion of collective bargaining agreements. The Legislature therefore enacted the ALRA's "mandatory mediation and conciliation" (MMC) provisions to "ensure a more effective collective bargaining process between agricultural employers and agricultural employees." (Stats. 2002, ch. 1145, § 1, p. 7401.) In certain cases in which an employer and a labor union have failed to reach a first contract, either party may invoke MMC, which involves a mediation process before a neutral mediator. (§ 1164 et seq. (the MMC statute).) If the parties do not reach an agreement on all terms through mediation, the mediator resolves the disputed terms and submits a proposed contract to the Board, which can then impose that contract on the parties.

In this case, the United Farm Workers of America (UFW) filed an MMC request with the Board after failing to reach a collective bargaining agreement with petitioner Gerawan Farming, Inc. (Gerawan). When mediation similarly failed to produce an agreement, the mediator submitted a report fixing the contractual terms, which the Board adopted in its final order. Gerawan petitioned for review of the Board's order, contending, among other things, that the MMC statutory scheme was unconstitutional. The Court of Appeal agreed, holding that "the MMC statute on its face violates equal protection principles" and that it "improperly delegated legislative authority." In so holding, the Court of Appeal adopted the reasoning of the dissent in *Hess Collection Winery v. Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584, 1611 (dis. opn. of Nicholson, J.) (*Hess*), in which the court upheld the MMC statute against a similar constitutional challenge (see *id.* at pp. 1603–1610 (maj. opn.)). We granted

2

review to resolve this conflict, and we conclude that the MMC statute neither violates equal protection nor unconstitutionally delegates legislative power.

We also granted review to resolve an important statutory question. In arguing that the final order should be set aside, Gerawan also claimed that the UFW, the labor union certified as the bargaining representative under the ALRA, had abandoned its employees after a lengthy absence and therefore forfeited its status as representative. Applying the settled rule that a union remains certified until decertified by the employees in a subsequent election, the Board concluded that the ALRA precludes employers from raising an abandonment defense to an MMC request. The Court of Appeal acknowledged the validity of the general rule but held that an employer may raise an abandonment defense against a union's demand to invoke MMC because MMC is "a postbargaining process" materially different from ordinary collective bargaining.

We hold that the distinction drawn by the Court of Appeal is untenable and that employers may not refuse to bargain with unions — whether during the ordinary bargaining process or during MMC — on the basis that the union has abandoned its representative status. As the Board and lower courts have consistently observed, the Legislature intended to reserve the power to decertify labor organization representatives to employees and labor organizations alone. Allowing employers to raise an abandonment defense would frustrate that intent and undermine the ALRA's comprehensive scheme of labor protections for agricultural employees.

## I.

The Legislature enacted the ALRA in 1975 to "ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations." (Stats. 1975, 3d Ex. Sess., ch.1, § 1, p. 4013.) "To achieve this goal, the act declares the right of agricultural employees to organize

3

themselves into unions and to engage in collective bargaining, free from intimidation by either employers or union representatives." (*ALRB I*, *supra*, 16 Cal.3d at p. 398; see § 1140.2.) In enacting the ALRA, the Legislature intended to fill a gap in the labor protections afforded by the federal National Labor Relations Act (NLRA), which exempts "any individual employed as an agricultural laborer." (29 U.S.C. § 152(3); see Lab. Code, § 1140.4 [defining "agricultural employee" as "those employees excluded from the coverage of the National Labor Relations Act, as amended, as agricultural employees"].) Accordingly, the ALRA identifies a number of unfair labor practices and other unlawful acts (§§ 1153, 1154, 1154.5, 1155.4, 1155.5), and empowers the Board to investigate, prevent, and remedy such practices (§ 1160).

The Board's other primary duty is to oversee and certify the results of bargaining representative elections. Under the ALRA, "[r]epresentatives designated or selected by a secret ballot for the purposes of collective bargaining by the majority of the agricultural employees in the bargaining unit shall be the exclusive representatives of all the agricultural employees in such unit for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment." (§ 1156; see § 1156.3 [setting forth the election process].) The ALRA also provides a process by which employees may petition to decertify a labor organization as their representative. (§ 1156.7.) Once a bargaining representative is certified, the ALRA requires the employer and the representative to "bargain collectively in good faith" in order to reach an agreement "with respect to wages, hours, and other terms and conditions of employment." (§ 1155.2, subd. (a).) The obligation to bargain in good faith "does not compel either party to agree to a proposal." (*Ibid.*)

In the decades that followed, it became clear that the ALRA had not resulted in the widespread adoption of collective bargaining agreements between

4

agricultural employers and employees. "Between 1975 and 2001 . . . , of the state's approximately 25,000 farm employers, there existed fewer than 250 signed union agreements and there were another 250 farms where workers voted for union representation but had not yet obtained a contract." (Broderdorf, *Overcoming the First Contract Hurdle: Finding a Role for Mandatory Interest Arbitration in the Private Sector* (2008) 23 Lab. Law. 323, 338.) A substantial factor was "the continued refusal of agricultural employers to come to the bargaining table once an election has occurred," which caused employees to "wait[] for years while negotiations for union contracts drag on without hope of progress." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1156 (2001–2002 Reg. Sess.) as amended Aug. 30, 2002, p. 7 (hereafter Sen. Bill 1156 Analysis).) As we have recognized, "when an employer engages in dilatory tactics after a representation election his action may substantially impair the strength and support of a union and consequently the employees' interest in selecting an agent to represent them in collective bargaining. . . . 'Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.' [Citations.]" (*J. R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 30 (*J. R. Norton*).) The Legislature found that in 2002, agricultural employers had not agreed to a contract in about 60 percent of the cases where a labor union had been certified. (See Sen. Bill 1156 Analysis, *supra*, at p. 7 [finding that among the 428 companies with agricultural workers who had voted for UFW representation, only 185 of those companies had reached a collective bargaining agreement with their employees]; see also Governor's signing message to Leg. on Assem. Bill No. 2596 and Sen. Bill No. 1156 (Sept. 30, 2002), Sen. Recess J. (2001–2002 Reg. Sess.) p. 6227.)

5

These concerns prompted the Legislature in 2002 to add the MMC provisions to the ALRA. (§ 1164 et seq., added by Stats. 2002, ch. 1145, § 2, pp. 7401–7404.) The Legislature determined there was "a need . . . for a mediation procedure in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the [ALRA], ameliorate the working conditions and economic standing of agricultural employees, create stability in the agricultural labor force, and promote California's economic well-being by ensuring stability in its most vital industry." (Stats. 2002, ch. 1145, § 1, p. 7401.)

The MMC statute sets forth a process, known as compulsory interest arbitration, "in which the terms and conditions of employment are established by a final and binding decision of an arbitrator." (Fisk & Pulver, *First Contract Arbitration and the Employee Free Choice Act* (2009) 70 La. L.Rev. 47, 50 (Fisk & Pulver).) Unlike "grievance arbitration," which focuses on "construing the terms of an existing agreement and applying them to a particular set of facts," interest arbitration "focuses on what the terms of a new agreement should be." (*Local 58, Intern. Broth. of Elec. Workers, AFL-CIO v. Southeastern Michigan Chapter, Nat. Elec. Contractors Assn., Inc.* (6th Cir. 1995) 43 F.3d 1026, 1030.) The MMC process results in "quasi-legislative action" by which "[t]he terms of the 'agreement' determined by the arbitrator [are] imposed upon [the employer] by force of law." (*Hess*, *supra*, 140 Cal.App.4th at p. 1597.)

Either an agricultural employer or a union representative may invoke the MMC process by filing with the Board "a declaration that the parties have failed to reach a collective bargaining agreement and a request that the board issue an order directing the parties to mandatory mediation and conciliation of their issues." (§ 1164, subd. (a).) Labor organizations certified before January 1, 2003, like the UFW here, must establish the following conditions before filing the declaration:

6

"(a) the parties have failed to reach agreement for at least one year after the date on which the labor organization made its initial request to bargain, (b) the employer has committed an unfair labor practice, and (c) the parties have not previously had a binding contract between them."  (§ 1164.11.)  Upon receipt of the declaration, "the board shall immediately issue an order directing the parties to" mediation before a neutral, agreed-upon mediator.  (§ 1164, subd. (b).)  Mediation then proceeds for 30 days, which can be extended by the mediator for an additional 30 days.  (§ 1164, subd. (c).)

Within 21 days after the mediation period expires, "the mediator shall file a report with the board that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process.  With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination.  The mediator's determination shall be supported by the record." (§ 1164, subd. (d).)  In crafting a determination, the mediator "may consider those factors commonly considered in similar proceedings, including:  [¶] (1) The stipulations of the parties.  [¶] (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands.  [¶] (3) The corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar agricultural operations with similar labor requirements.  [¶] (4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed.  [¶] (5) The average consumer

7

prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed." (§ 1164, subd. (e).)

The MMC statute establishes a two-tiered system of review. Within seven days, either party may petition the Board to review the mediator's report on the ground that one or more provisions are (1) "unrelated to wages, hours, or other conditions of employment . . . ," (2) "based on clearly erroneous findings of material fact," or (3) "arbitrary or capricious in light of the mediator's findings of fact." (§ 1164.3, subd. (a).) If no petition is filed, or if the Board finds that the petition has not made a prima facie case for review on the grounds set forth in subdivision (a), then the mediator's report becomes the final order of the Board. (*Id.*, subd. (b).) If the Board finds grounds to grant review, it shall issue a decision concerning the petition and, upon finding a provision in the mediator's report to be unlawful on the grounds set forth in subdivision (a), shall require the mediator to modify the terms of the collective bargaining agreement, to meet with the parties for further mediation, and to submit a second report. (*Id.*, subd. (c).) Either party may petition the Board for review of the second report. (*Id.*, subd. (d).) Again, if no petition is filed, or if a petition is filed but does not state a prima facie case of a violation under subdivision (a), the report takes effect as an order of the Board. (*Ibid.*) If a petition is subject to review under subdivision (a), the Board shall determine the issues and issue a final order. (*Ibid.*) Either party also may petition the Board to set aside the report if "(1) the mediator's report was procured by corruption, fraud, or other undue means, (2) there was corruption in the mediator, or (3) the rights of the petitioning party were substantially prejudiced by the misconduct of the mediator." (*Id.*, subd. (e).)

Once the Board has issued a final order, a party may petition for writ of review in the Courts of Appeal or in this court. (§§ 1164.5, 1164.9.) Judicial

8

review is limited to "determin[ing], on the basis of the entire record, whether any of the following occurred: [¶] (1) The board acted without, or in excess of, its powers of jurisdiction. [¶] (2) The board has not proceeded in the manner required by law. [¶] (3) The order or decision of the board was procured by fraud or was an abuse of discretion. [¶] (4) The order or decision of the board violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1164.5).

Soon after the Legislature enacted the MMC statute, agricultural employers challenged its constitutionality. In *Hess*, the Court of Appeal rejected claims that the MMC statutory scheme violated principles of due process and equal protection, interfered with the right of contract, invalidly delegated legislative authority, and was vague and overbroad. (*Hess*, *supra*, 140 Cal.App.4th at p. 1591.) Justice Nicholson dissented, contending that the law "delegated legislative power unconstitutionally and violated equal protection guarantees of the state and federal Constitutions." (*Id.* at p. 1611 (dis. opn. of Nicholson, J.); see *id.* at pp. 1612–1617.)

According to the UFW, the union "began renewing demands for bargaining with agricultural employers that had never agreed to contracts" after *Hess* upheld the MMC statute's constitutionality. This case arises from one of those renewed demands.

**II.**

Gerawan is a farming business that owns about 12,000 acres in Fresno and Madera Counties. It employs thousands of direct-hire workers to grow, harvest, and pack stone fruit and table grapes. In a 1990 secret election, Gerawan's employees voted to be represented by the UFW. After rejecting Gerawan's challenges to the election, the Board certified the UFW as the exclusive bargaining representative on July 8, 1992. (See *Gerawan Ranches* (1992) 18 ALRB No. 5.)

9

The Board also affirmed an administrative law judge's finding that Gerawan had committed unfair labor practices during the election period. (*Ibid.*)

Several days later, Cesar Chavez, the UFW's founder, sent a letter to Gerawan requesting negotiations, which Gerawan "formally accept[ed]." The UFW made a renewed request to bargain in November 1994, after which the parties held at least one negotiation session. The parties did not reach an agreement. After the negotiation session, according to a former Gerawan executive, the UFW "represented that it would revise its proposal . . . and that it would contact Gerawan about future negotiations," but the "UFW never contacted Gerawan again concerning [those] negotiations."

For reasons not apparent in the record, neither the UFW nor Gerawan attempted to communicate or restart negotiations until October 12, 2012, when the UFW served Gerawan with a renewed demand to bargain. Gerawan asked the UFW to explain its absence between early 1995 and October 2012; the UFW refused. The parties then proceeded to negotiations, holding more than 10 bargaining sessions in early 2013. Having failed to reach a voluntary agreement, the UFW filed a declaration on March 29, 2013 with the Board requesting MMC. Gerawan opposed the request, claiming that the statutory prerequisites had not been met and that the UFW had abandoned its status as the bargaining representative. Several weeks later, the Board denied Gerawan's opposition and referred the parties to MMC. (*Gerawan Farming, Inc.* (2013) 39 ALRB No. 5.) The Board specifically rejected Gerawan's claim that the "UFW abdicated its responsibilities" and "forfeit[ed] its status as bargaining representative," noting that the Board had "considered and rejected this type of 'abandonment' argument" in the past. (*Id.* at pp. 3–4, citing *Dole Fresh Fruit Company* (1996) 22 ALRB No. 4; *Pictsweet Mushroom Farms* (2003) 29 ALRB No. 3; *San Joaquin Tomato Growers, Inc.* (2011) 37 ALRB No. 5.) Because the Board declined to consider

10

Gerawan's abandonment argument, it took no evidence and made no findings concerning the UFW's alleged absence.

The parties thereafter agreed on an experienced mediator, Matthew Goldberg, and conducted several mediation sessions in the summer of 2013. The voluntary mediation failed to produce an agreement. As required by section 1164, subdivision (a), Goldberg then conducted a number of on-the-record hearings and submitted a report resolving the disputed terms to the Board on September 28, 2013. Gerawan objected to Goldberg's report "both generally and as to its particular terms." In light of these objections, the Board remanded six provisions to the mediator for further proceedings. (*Gerawan Farming, Inc.* (2013) 39 ALRB No. 16.) The parties reached agreement on the remanded provisions, and Goldberg issued a second report incorporating the agreed-upon provisions. Neither party objected to the second report, and it took effect as the Board's final order on November 19, 2013. (*Gerawan Farming, Inc.* (2013) 39 ALRB No. 17; see § 1164.3.)

Gerawan filed a petition for review of the Board's final order to the Court of Appeal under section 1164.5, claiming that the order was invalid because the MMC statute is unconstitutional. Gerawan argued that the statute violated equal protection and due process, invalidly delegated legislative power, and constituted an unconstitutional taking of private property. Gerawan also reiterated that the Board's order should be set aside because the UFW abandoned its status as the employees' certified bargaining representative after a "nearly two-decade absence." The Court of Appeal granted Gerawan's request to stay the Board's final order pending the appeal.

The Court of Appeal held that the MMC statute was facially unconstitutional because it "violates equal protection of the law and improperly delegates legislative authority." As to equal protection, the court adopted the

11

reasoning of the *Hess* dissent: Within the class of employers covered by the MMC process, " 'each employer will be subjected to a different legislative act, in the form of a [collective bargaining agreement]. Thus, similarly situated employers are treated dissimilarly.' " In the court's view, the MMC statute's "discrimination . . . is intentional because the mediator has no power to extend the enactment to other agricultural employers. . . . [and] the discrimination is arbitrary because there are no standards" ensuring that mediators will reach similar decisions when considering similarly situated employers. The court acknowledged that section 1164 provides factors to guide the mediator's decisionmaking, but held that the factors failed to "cure the fundamental equal protection violation" because "[i]nevitably, each imposed [collective bargaining agreement] will still be its own set of rules applicable to one employer, but not to others."

The court further concluded that the MMC statute unconstitutionally delegates legislative authority because it empowers the mediator "to establish employment terms that will be imposed by the force of law . . . without any definite policy direction, goal or standard." Because the section 1164.3, subdivision (e) "factors alone are not enough," the law "fails to supply the necessary guidance to either the mediator or the Board." Further, the court held, "the delegation of powers under the MMC statute also lacks the necessary procedural safeguards or mechanisms to assure a fair and evenhanded implementation of the legislative mandate to impose a [collective bargaining agreement]." The court did not resolve Gerawan's other constitutional claims.

Despite holding the MMC statute "constitutionally invalid," the Court of Appeal also decided "the statutory issues as an alternative basis for [its] ruling." The court concluded that "abandonment may be raised defensively in response to a union's demand to invoke the substantial legal measures of the MMC process,"

12

notwithstanding the Board's longstanding position that "abandonment does not exist unless a union is either *unwilling* or *unable* to continue to represent the subject employees." The court recognized that under its precedent holding that "a rebuttable presumption exists that a certified union continues to enjoy majority support by the employees," an employer may not refuse to bargain under the ALRA by contending that the union has forfeited its representative status. But because "the MMC process differs materially from bargaining and is largely a postbargaining process," the court continued, "the employer's continuing duty to bargain is *not* an impediment" to an "employer's ability to defend a union's MMC request." The court thus held that the Board abused its discretion by ordering MMC without considering Gerawan's claim of union abandonment.

### III.

We now consider Gerawan's claims that the MMC statute (1) violates substantive due process by imposing interest arbitration without the employer's consent, (2) violates equal protection under the Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution, and (3) unconstitutionally delegates legislative power. Although we typically decide statutory claims before deciding constitutional claims, we discuss Gerawan's constitutional claims first because the Court of Appeal held the statute facially unconstitutional in addition to resolving Gerawan's statutory claim. Were we to hold that abandonment is a defense under the MMC statute, our holding would have no import in light of the Court of Appeal's decision without a determination that the statute is constitutional. And were we to hold that abandonment is not a defense under the MMC statute, we would likewise need to address Gerawan's constitutional claims.

At the outset, it is important to note that the Court of Appeal held the statute *facially* unconstitutional. Gerawan has likewise characterized its challenge

13

as a facial attack on the MMC statute and has not articulated an as-applied challenge based on the specific terms of the contract imposed by the Board's final order. "The standard for a facial constitutional challenge to a statute is exacting." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218.) Under "the strictest requirement for establishing facial unconstitutionality," the challenger must demonstrate that "the statute 'inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' " (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126, quoting *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181 (*Brown*).) We have sometimes applied a more lenient standard, asking whether the statute is unconstitutional "in the *generality* or *great majority* of cases." (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 673 (*San Remo*).) In claiming that the MMC statute is unconstitutional in all cases, Gerawan attempts to meet the strictest requirement. But we need not decide which test applies because, as explained below, the statute is not facially invalid under either test.

### A.

Gerawan's lead argument in its briefing is that compulsory interest arbitration in the private sector is categorically impermissible because it forces employers into arbitration without their consent. This is essentially a claim that the MMC statute violates substantive due process. Although Gerawan raised various due process challenges below, the Court of Appeal declined to address them and instead found the statute unconstitutional on equal protection and nondelegation grounds. Nevertheless, since the ALRB and the UFW respond to Gerawan's substantive due process argument in detail here, we address the claim.

Gerawan acknowledges that interest arbitration has "emerged as a fairly common feature of public sector labor relations at the federal, state, and local levels." (Weiler, *Striking A New Balance: Freedom of Contract and the Prospects*

14

*for Union Representation* (1984) 98 Harv. L.Rev. 351, 372; see Fisk & Pulver, *supra*, at pp. 50–51.) But Gerawan contends that no state has ever imposed compulsory interest arbitration on private employers because doing so would be unconstitutional. Gerawan places significant emphasis on a trilogy of cases from the 1920s that held unconstitutional a Kansas statute authorizing a three-judge industrial court to arbitrate employment disputes and impose wages and other terms of employment. (See *Wolff Co. v. Industrial Court* (1923) 262 U.S. 522 (*Wolff*); *Dorchy v. Kansas* (1924) 264 U.S. 286; *Wolff Packing Co. v. Indus. Court* (1925) 267 U.S. 552.)

In *Wolff*, the high court concluded that the statute violated "the liberty of contract" under the Fourteenth Amendment. (*Wolff*, *supra*, 262 U.S. at p. 544.) The court relied on precedent that had located "the right of the employer on the one hand, and of the employee on the other, to contract about his affairs" in substantive due process. (*Id.* at p. 534, citing *Adkins v. Children's Hospital* (1923) 261 U.S. 525 (*Adkins*).) As we have explained, "this restrictive view of the police power was completely repudiated" by the high court a decade later. (*Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 155 (*Birkenfeld*); see *West Coast Hotel Co. v. Parrish* (1937) 300 U.S. 379, 400 [overruling *Adkins*]; Pope, *Contract, Race, and Freedom of Labor in the Constitutional Law of "Involuntary Servitude"* (2010) 119 Yale L.J. 1474, 1543 [*Wolff*'s "anchorage in Fourteenth Amendment economic due process, never secure, has altogether washed away"].) Thus, Gerawan's claim that private-sector interest arbitration offends substantive due process is unpersuasive. (See *Hess*, *supra*, 140 Cal.App.4th at pp. 1598–1601.)

Gerawan also relies on *Labor Board v. Jones & Laughlin* (1937) 301 U.S. 1 (*Jones*) and *Porter Co. v. NLRB* (1970) 397 U.S. 99 (*Porter*), where the high court interpreted the NLRA to prohibit compulsory arbitration. But the high court

15

resolved these decisions on statutory grounds and said nothing about compulsory arbitration's constitutionality.  (See *Jones*, at p. 45; *Porter*, at pp. 104–109.)

The rareness of interest arbitration in the private sector likely stems from the high court's determination that the NLRA, which preempts most state labor regulation, does not authorize compulsory arbitration.  Contrary to what Gerawan contends, there is no indication in the high court's case law that compulsory arbitration in areas *not* covered by the NLRA, such as agricultural labor relations, would be unconstitutional.  Seeing no authority to support Gerawan's substantive due process claim, we decline to find compulsory interest arbitration categorically unconstitutional here.

**B.**

The Court of Appeal held that the MMC statute "on its face violates equal protection principles" under both the federal and state Constitutions.  We conclude that the MMC is not facially invalid on equal protection grounds because the Legislature had a rational basis for enacting the MMC statute to facilitate collective bargaining agreements between agricultural employers and employees.

" '[I]n areas of social and economic policy,' " this court interpreting California's equal protection clause, like the United States Supreme Court interpreting the federal equal protection clause, has said that " 'a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' " (*Warden v. State Bar* (1999) 21 Cal.4th 628, 644 (*Warden*), quoting *FCC v. Beach Communications, Inc*. (1993) 508 U.S. 307, 313 (*Beach Communications*), italics omitted.)  Although some cases raising federal and state equal protection challenges may require a bifurcated analysis (see, e.g., *In re*

16

*Marriage Cases* (2008) 43 Cal.4th 757, 843–844), Gerawan argues, and we agree, that the federal and state standards operate the same way here.

"[U]nder the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more crucial or imperative." (*Warden*, *supra*, 21 Cal.4th at p. 644.) Making such regulatory distinctions " 'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.' " (*Beach Communications*, *supra*, 508 U.S. at pp. 315–316.) Where "[a]n administrative order [is] legislative in character," as is the case with a Board order under the MMC statute, it "is subject to the same tests as to validity as an act of the Legislature." (*Knudsen Creamery Co. v. Brock* (1951) 37 Cal.2d 485, 494; see 2 Cal.Jur.3d (2017) Administrative Law § 360.) Accordingly, we apply the same rational basis test to a final order by the Board imposing the mediator's report as we would apply to a legislative act imposing the same.

Gerawan does not contend that the Legislature lacked a rational basis for applying the MMC statute only to agricultural employers who fail to reach a first collective bargaining agreement. Gerawan concedes, and we agree, that "differentiat[ing] between those employers with an existing [collective bargaining agreement] and those without . . . may bear a rational relationship to the statutory purpose of promoting collective bargaining." "First contracts create particularly complicated bargaining situations because the parties have less information about each other's bargaining behavior than in more established relationships. . . . Unions face the added difficulties of navigating the immature relationship between

17

leadership and the rank and file membership and pacifying more hostile employers who are more likely to 'bust the union' because they are not used to having to negotiate the terms and conditions of employment. . . . The difficulties involved in first contract negotiations have effects beyond the first contract because they set the tone for the ongoing union-management relationship." (Fisk & Pulver, *supra*, at p. 54.)

These concerns were the impetus for the MMC statute's enactment. The Legislature was aware that the ALRA had failed to promote collective bargaining agreements, finding that almost 60 percent of union representation elections did not result in a first contract. (See Sen. Bill 1156 Analysis, *supra*, at p. 7.) In light of the "peculiar problems with the collective bargaining process between agricultural employers and agricultural employees" (*Hess*, *supra*, 140 Cal.App.4th at p. 1604), the Legislature reasonably could have concluded that a mediation process followed by binding arbitration in the event of a bargaining impasse would "correct" the ALRA's failure and facilitate the adoption of first contracts (Sen. Bill 1156 Analysis, *supra*, at p. 7). The Legislature also reasonably could have believed that facilitating first contracts furthers the goal of "ensuring stability" in the agricultural industry. (Stats. 2002, ch. 1145, § 1, p. 7401; see Weiler, *supra*, at p. 409 ["[F]irst-contract arbitration attempts to do more than simply settle a past dispute: it also seeks to install the union firmly within the plant and to . . . allow[] employees to experience life under a collective agreement, a contract one hopes is attractive enough to warrant renewal."].)

We reject Gerawan's argument that the MMC process is unconstitutionally arbitrary because it allows a "self-interested union to compel the regulation of individual employers of its choosing." The statute permits either the union representative or the employer to file a declaration with the Board requesting MMC. (§ 1164, subd. (a).) Even if unions are more likely to demand MMC than

18

employers, the Legislature empowered *the Board*, not the parties, to assess whether the statutory prerequisites are met before it orders MMC. The parties must have never had a contract, they must have "failed to reach agreement for at least one year" after the initial request to bargain, and the employer must have committed an unfair labor practice. (§ 1164.11; see § 1164, subd. (a).) That determination is then subject to judicial review. (§ 1164.5.) In light of these criteria and the Board's role in determining whether they are met, the fact that the MMC process is initiated by a party does not make it arbitrary or irrational.

Gerawan's primary equal protection argument is not that the MMC statutory scheme treats classes of employers differently, but that it discriminates against *each* individual agricultural employer *within* the covered class of employers. The Court of Appeal accepted this argument, concluding that "[t]he necessary outworking of the MMC statute is that each individual employer (within the class of agricultural employers who have not entered a first contract) will have a distinct, unequal, individualized set of rules imposed on it. . . . This is . . . 'the very antithesis of equal protection.' " The Court of Appeal and Gerawan invoke the principle that "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.' " (*Engquist v. Oregon Dept. of Agriculture* (2008) 553 U.S. 591, 601 (*Engquist*).)

The high court first articulated the "class of one" theory of equal protection in *Village of Willowbrook v. Olech* (2000) 528 U.S. 562 (*Olech*). There, Grace Olech claimed that the village violated equal protection by conditioning her connection to the municipal water supply on the Olechs granting the village a 33-foot easement, while only requiring a 15-foot easement from other property owners seeking access to the same water supply. (*Id.* at p. 563.) Olech alleged

19

that the easement demand was " 'irrational and wholly arbitrary,' " and was "motivated by ill will resulting" from previous litigation. (*Ibid.*) The high court recognized that "successful equal protection claims [can be] brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." (*Id.* at p. 564.)

But laws regulating a small number of individuals, or even a class of one, are not necessarily suspect. As the high court has explained, "[t]he premise that there is something wrong with particularized legislative action is of course questionable. While legislatures usually act through laws of general applicability, that is by no means their only legitimate mode of action. . . . Even laws that impose a duty or liability upon a single individual or firm are not on that account invalid." (*Plaut v. Spendthrift Farm, Inc.* (1995) 514 U.S. 211, 239, fn. 9.) Rather, such regulations violate equal protection only "if arbitrary or inadequately justified." (*Bank Markazi v. Peterson* (2016) 578 U.S. __, __, fn. 27 [136 S.Ct. 1310, 1327, fn. 27], citing *Olech*, *supra*, 528 U.S. at p. 564.)

In *Engquist,* the high court held that the " 'class-of-one' theory of equal protection has no place in the public employment context." (*Engquist*, *supra*, 553 U.S. at p. 594.) Although it relied in part on the distinction between the government "as employer as opposed to sovereign," the court also stressed the "core concern of the Equal Protection Clause as a shield against arbitrary classifications." (*Id.* at p. 598.) Unlike the easement decision in *Olech*, the court explained, "[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an

20

accepted consequence of the discretion granted.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." (*Id.* at p. 603.)

Although *Engquist*'s holding was limited to the public employment context, our Courts of Appeal have concluded that "its reasoning applies more broadly." (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 859 (*Las Lomas*); see *Squires v. City of Eureka* (2014) 231 Cal.App.4th 577, 595 ["individualized discretionary decisions will not support a class of one claim"].) The Ninth Circuit has also read *Engquist* to foreclose class of one claims against any "forms of state action that 'by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.' " (*Towery v. Brewer* (9th Cir. 2012) 672 F.3d 650, 660.)  Other courts have held that although "*Engquist* does not bar all class-of-one claims involving discretionary state action," its reasoning may still be "properly applied outside of the employment context."  (*Analytical Diagnostic Labs, Inc. v. Kusel* (2d Cir. 2010) 626 F.3d 135, 142; see *Hanes v. Zurick* (7th Cir. 2009) 578 F.3d 491, 495.)

Applying *Engquist*'s reasoning, the ALRB argues that the MMC process is "an inherently individualized process" and thus cannot be subject to a class of one challenge.  We decline to address whether a class of one claim may be brought under the equal protection clause because even assuming that such a claim may be brought here, we conclude that the MMC statute does not facially violate equal protection.

To succeed on a class of one claim, a plaintiff must establish that "(1) the plaintiff was treated differently from other similarly situated persons, (2) the difference in treatment was intentional, and (3) there was no rational basis for the difference in treatment."  (*Las Lomas*, *supra*, 177 Cal.App.4th at p. 858, citing

21

*Olech*, *supra*, 528 U.S. at p. 564.) There is no question that differences in treatment among agricultural employers under the MMC statute is "intentional" (*Las Lomas*, at p. 858), since the point of the scheme is to make agreements tailored to the parties' individualized circumstances and relationships. But Gerawan has failed to satisfy either of the other two requirements.

We find unpersuasive Gerawan's claim that the MMC statute is unconstitutionally arbitrary because of the "lack of any nexus between the statutory purpose and the distinctions drawn by any individual mediator." The purpose of the MMC statute is to promote collective bargaining and ensure stability in the agricultural labor force. (Stats. 2002, ch. 1145, § 1, p. 7401.) The statute accomplishes its purposes by empowering mediators to make individualized determinations regarding the terms of particular collective bargaining agreements. These individualized determinations are rationally related to the Legislature's legitimate interest in ensuring that collective bargaining agreements are tailored to the unique circumstances of each employer. As the Board explains, "[c]ontract terms appropriate for a 25-employee family farm may make little sense at a 5,000-employee agricultural corporation, and reasonable wages and benefits will necessarily vary across company size, crop, and geographic region."

The discretion afforded to the mediator under the MMC statute is channeled by section 1164's statutory factors. As noted, the statute instructs the mediator to "consider those factors commonly considered in similar proceedings, including: [¶] (1) The stipulations of the parties. [¶] (2) The financial condition of the employer and its ability to meet the costs of the contract in those instances where the employer claims an inability to meet the union's wage and benefit demands. [¶] (3) The corresponding wages, benefits, and terms and conditions of employment in other collective bargaining agreements covering similar

22

agricultural operations with similar labor requirements. [¶] (4) The corresponding wages, benefits, and terms and conditions of employment prevailing in comparable firms or industries in geographical areas with similar economic conditions, taking into account the size of the employer, the skills, experience, and training required of the employees, and the difficulty and nature of the work performed. [¶] (5) The average consumer prices for goods and services according to the California Consumer Price Index, and the overall cost of living, in the area where the work is performed." (§ 1164, subd. (e).)

These statutory factors serve to further the MMC's purposes while minimizing arbitrary or irrational differences between the collective bargaining agreements imposed by the MMC process on similarly situated agricultural employers. (See *Hess*, *supra*, 140 Cal.App.4th at p. 1604 ["These requirements reasonably ensure that contracts of different employers will be similar."].) We relied on similar reasoning in rejecting an equal protection claim in *People v. Wilkinson* (2004) 33 Cal.4th 821. There, we held that the exercise of a prosecutor's charging discretion did not violate equal protection principles in part because "numerous factors properly may enter into a prosecutor's decision to charge under one statute and not another, such as a defendant's background and the severity of the crime." (*Id.* at p. 838; see *RUI One Corp. v. City of Berkeley* (9th Cir. 2004) 371 F.3d 1137, 1154 [rejecting equal protection challenge to City's expansion of coverage of living wage ordinance to "only a handful of employers" based on geographic, employer-size, and revenue criteria].)

We note that section 1164, subdivision (e) provides that the mediator "may consider" these statutory factors. In *Hess*, the court concluded that in this context the statute's reference to " 'may' means 'must' " because " ' "[w]ords permissive in form . . . are considered as mandatory" ' " when duties of public entities like the Board are at issue. (*Hess*, *supra*, 140 Cal.App.4th at p. 1607.) Neither Gerawan

23

nor the Court of Appeal assigns any significance to the statute's use of the word "may," and the Court of Appeal simply assumed that a mediator "*shall* consider this list of factors." (Italics added.) We need not decide how to interpret "may" as used in section 1164, subdivision (e), because Gerawan's argument is that even if the mediator does consider the statutory factors, the factors themselves do not sufficiently constrain the mediator's discretion. As explained, we reject that argument.

Gerawan further argues that "[b]ecause the statute does not pass any judgments as to the *sort* of terms that would foster collective bargaining and stability, a mediator could consider one employer's wages with relation to 'comparable firms' and choose to impose a wage increase, a wage decrease, or no change at all." The Court of Appeal took the same view, posing a hypothetical in which mediators impose collective bargaining agreements on three similar employers with "different terms . . . result[ing] in different wages and a different impact on the profit margin for each employer."

Arbitrary treatment is of course possible under the MMC statute, just as it is possible with respect to a host of governmental functions that involve discretionary decisionmaking. But in order to succeed on a facial challenge, it is not enough to show that *some* hypothetical applications of the MMC statute might result in arbitrary or discriminatory treatment. Instead, Gerawan must show that the statute "inevitably pose[s] a present total and fatal conflict" with equal protection principles (*Brown*, *supra*, 29 Cal.3d at p. 181) or, at the least, that the statute violates equal protection "in the *generality* or *great majority* of cases." (*San Remo*, *supra*, 27 Cal.4th at p. 673.)

Gerawan has raised no as-applied challenge in this case, so we need not resolve whether an as-applied class of one challenge is cognizable in this context. Gerawan does not claim to have evidence that it was treated differently by the

24

mediator or the Board from similarly situated agricultural employers that have undergone the MMC process, or that a similarly situated agricultural employer even exists. Indeed, Gerawan does not mention any specific terms of the mediator's report in its equal protection argument. And Gerawan concedes that the mediator was unable to find any agricultural employer that was sufficiently similar in terms of farm operations upon which to model the proposed collective bargaining agreement. Gerawan instead chose to focus solely on the asserted facial unconstitutionality of the MMC statute. Simply hypothesizing, as the Court of Appeal did, that differential treatment among similarly situated agricultural employers is possible is not enough to declare the MMC statute facially unconstitutional. In sum, the statute does not facially violate equal protection principles.

## C.

The Court of Appeal also held that the MMC statute improperly delegates legislative authority in violation of the California Constitution. We disagree.

"[A]lthough it is charged with the formulation of policy," the Legislature "properly may delegate some quasi-legislative or rulemaking authority." (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299.) "For the most part, delegation of quasi-legislative authority . . . is not considered an unconstitutional abdication of legislative power." (*Ibid.*) "The doctrine prohibiting delegations of legislative power does not invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established to guide the power's use and to protect against misuse." (*People v. Wright* (1982) 30 Cal.3d 705, 712–713 (*Wright*).) Accordingly, "[a]n unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy." (*Carson Mobilehome Park Owners' Assn. v.*

25

*City of Carson* (1983) 35 Cal.3d 184, 190 (*Carson*); *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 491–492; see *Kugler v. Yocum* (1968) 69 Cal.2d 371, 384 (*Kugler*) ["Only in the event of a total abdication of that power, through failure either to render basic policy decisions or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an 'unlawful delegation.' "].)

The MMC process does not suffer from either defect. First, the Legislature did not leave the resolution of fundamental policy issues to others. In *ALRB I*, we held that an ALRB regulation providing farm labor organizers a qualified right of access to agricultural employers' premises did not constitute an unconstitutional delegation of legislative power. (*ALRB I*, *supra*, 16 Cal.3d at p. 419.) We concluded that "the 'fundamental policy determination' was made by the Legislature when that body decided, after much study and discussion, to grant to agricultural workers throughout California the rights of self-organization and collective bargaining so long denied to them under federal law." (*Ibid.*) Because the access regulation "merely implement[ed]" the statutory program, "it [did] not amount to a 'fundamental policy determination.' " (*Ibid.*)

The same is true here. The Legislature made the fundamental policy determination that the MMC process was necessary "in order to ensure a more effective collective bargaining process between agricultural employers and agricultural employees, and thereby more fully attain the purposes of the [ALRA]." (Stats. 2002, ch. 1145, § 1, p. 7401.) It did so in response to evidence showing that the ALRA had failed in its goal of promoting the adoption of collective bargaining agreements by agricultural employers. The Legislature then made a variety of subsidiary policy decisions concerning the necessary procedures, the factors channeling the mediator's discretion, the preconditions for invoking the MMC process, and the extent of review by the Board and the courts.

26

(§§ 1164, 1164.3, 1164.5, 1164.11.) The Legislature tasked the mediator with resolving the precise terms concerning "wages, hours, or other conditions of employment" in a single collective bargaining agreement. (§ 1164.3, subd. (a)(1).) But even with regard to those terms, the mediator's role is limited to resolving only *disputed* terms. (§ 1164, subd. (d).)

Thus, the nondelegation argument here is even weaker than the one we rejected in *ALRB I*, which concerned a statewide access regulation. As Gerawan concedes, the policy decisions made by the mediator relate only to *the parties'* "economic relations" and rights. In authorizing the mediator and the Board to decide the precise contours of an individual collective bargaining agreement, the MMC statute does not confer "unrestricted authority to make fundamental policy determinations" that must be left to the Legislature. (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 816.) In *Brown*, we dismissed an unlawful delegation challenge to statutes that allowed a memorandum of understanding between the Governor and an employee representative to supersede certain Government Code sections governing public employment. (See *Brown*, *supra*, 29 Cal.3d at p. 201.) We observed that the statutes "do not involve fundamental policy determinations, but rather relate to the working details of the wages, hours and working conditions of the employees covered by the act." (*Ibid.*) The Legislature "may declare a policy, fix a primary standard, and authorize" mediators "to determine the application of the policy or standard to the facts of particular cases" without violating the nondelegation doctrine. (*Birkenfeld*, *supra*, 17 Cal.3d at p. 167.)

Second, the MMC statute does not "fail[] to provide adequate direction for [its] implementation." (*Carson*, *supra*, 35 Cal.3d at p. 190.) The Legislature indicated that the mediator, in resolving disputed issues, "may consider those factors commonly considered in similar proceedings," including the parties'

27

stipulations; the employer's financial condition; corresponding terms in comparable collective bargaining agreements, firms, or industries; the average consumer prices for goods and services; and the overall cost of living. (§ 1164, subd. (e).) The Court of Appeal concluded that these statutory factors do not cure the delegation problem because they do "not provide the mediator with any policy objective to be carried out or standard to be attained once those factors have been considered." But we have previously rejected the argument that such a "listing of factors does not adequately inform [the administrative authority] just how the presence of the factors under particular circumstances is to be translated." (*Birkenfeld*, *supra*, 17 Cal.3d at p. 168.)

In *Birkenfeld*, we considered a constitutional challenge to a Berkeley charter amendment establishing residential rent control. The plaintiffs argued that the charter amendment's provisions for adjusting maximum rents "faile[d] to provide sufficient standards for the guidance of the rent control board . . . and thereby constitute[d] an unlawful delegation of legislative power." (*Birkenfeld*, *supra*, 17 Cal.3d at p. 167.) In dismissing this challenge, we emphasized that the amendment directed the rent control board to consider a nonexclusive list of factors when reviewing petitions for rent adjustments. (*Id.* at pp. 167–168.) And we noted that the board was "given other significant guidance by the charter amendment's statement of purpose" because "[s]tandards sufficient for administrative application of a statute can be implied by the statutory purpose." (*Id.* at p. 168.) "By stating its purpose and providing a nonexclusive illustrative list of relevant factors to be considered," we concluded, "the charter amendment provides constitutionally sufficient legislative guidance to the Board." (*Ibid.*)

Gerawan contends that *Birkenfeld* is distinguishable because the rent control scheme there provided a "discernible statutory objective" to guide the board's consideration of the statutory factors. But in *Birkenfeld*, the charter

28

amendment's stated purpose was simply "counteracting the ill effects of 'rapidly rising and exorbitant rents exploiting [the housing] shortage.' [Citation.]" (*Birkenfeld*, *supra*, 17 Cal.3d at p. 168.) From that stated purpose, we implied "a standard of fixing maximum rent levels at a point that permits the landlord to charge a just and reasonable rent." (*Ibid.*) Likewise, the MMC statute expressly states its purpose — "to ensure a more effective collective bargaining process between agricultural employers and agricultural employees" (Stats. 2002, ch. 1145, § 1, p. 7401) — from which we can imply a standard of reaching just and reasonable collective bargaining agreements based on relevant considerations such as the nonexclusive list of factors set forth in section 1164, subdivision (e). This implied standard provides sufficient legislative direction to the mediator.

Gerawan's argument that the Legislature should determine "the specific formula or objective pursuant to which the delegee would operate" fares no better. In the rent control context, we have said the fact that an "ordinance does not articulate a formula for determining just what constitutes a just and reasonable return does not make it unconstitutional." (*Carson*, *supra*, 35 Cal.3d at p. 191; see *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 768; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 680.) Similarly, the high court has held in the ratemaking context that "[t]he Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas." (*Federal Power Commission v. Natural Gas Pipeline Co.* (1942) 315 U.S. 575, 586.) The Legislature here was not required to provide a specific formula for mediators to follow in resolving disputed terms of individual collective bargaining agreements. It is sufficient that the MMC statute sets forth a nonexclusive list of factors for the mediator to consider when developing a fair and reasonable agreement based on the parties' individualized circumstances. The Legislature has given the mediator constitutionally "adequate direction." (*Carson*, at p. 190.)

This conclusion is consistent with substantial precedent rejecting similar nondelegation challenges to compulsory interest arbitration in the public employment context.  In *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, we rejected a nondelegation challenge to a Vallejo city charter provision that permitted an arbitral board to resolve disputed terms of employment after considering " 'all factors relevant to the issues from the standpoint of both the employer and the employee, including the City's financial condition.' " (*Id.* at p. 622.)  We held that so long as "the arbitrators do not proceed beyond the provisions of the Vallejo charter, there is no unlawful delegation of legislative power." (*Ibid.*, fn. 13.)

"Other jurisdictions have sanctioned their compulsory interest arbitration schemes even though presented with less precise or even non-explicit standards for decision" than the type of factors set out in the MMC statute.  (*City of Detroit v. Detroit Police Officers Ass'n* (1980) 408 Mich. 410, 464–465; see, e.g., *Fraternal Order of Police Lodge No. 165 v. City of Choctaw* (Okla. 1996) 933 P.2d 261, 267–268 (*Choctaw*); *Superintending School Committee of City of Bangor v. Bangor Ed. Ass'n* (Me. 1981) 433 A.2d 383, 387 (*City of Bangor*); *City of Richfield v. Local No. 1215, Intern. Ass'n of Fire Fighters* (Minn. 1979) 276 N.W.2d 42, 47; *Division 540, Amalgamated Transit Union, AFL-CIO v. Mercer County Improvement Authority* (1978) 76 N.J. 245, 252–254; *Harney v. Russo* (1969) 435 Pa. 183, 189.)  Other compulsory arbitration statutes provide "a well-settled list of factors" that closely resembles that set forth in section 1164, subdivision (e).  (Fisk & Pulver, *supra*, at p. 66 [citing statutes].)  "Formulation of rigid standards for the guidance of arbitrators in dealing with complex and often volatile issues would be impractical, and might destroy the flexibility necessary for the arbitrators to carry out the legislative policy of promoting the improvement

30

of the relationship between public employers and their employees." (*City of Bangor*, at p. 387.)

Gerawan does not dispute these authorities but contends that "[t]he delegation issues present here are not as problematic where the employer is a public entity." It is not clear why that is so. With regard to certain constitutional rights such as free speech and workplace privacy, the state may have "significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." (*Engquist*, *supra*, 553 U.S. at p. 599; see *Garcetti v. Ceballos* (2006) 547 U.S. 410; *National Aeronautics and Space Admin. v. Nelson* (2011) 562 U.S. 134; *Connick v. Myers* (1983) 461 U.S. 138.) But whether a statute impermissibly delegates legislative power does not turn on that distinction. Whether the law at issue regulates public employees, private employees, or nonemployment matters, the test is the same: Has the Legislature "provide[d] an adequate yardstick for the guidance of the administrative body empowered to execute the law"? (*Clean Air Constituency v. California State Air Resources Bd.*, *supra*, 11 Cal.3d at p. 817.) As explained above, the MMC statute provides such guidance.

In addition to sufficiently clear standards, a statute delegating legislative power must be accompanied by " 'safeguards adequate to prevent its abuse.' " (*Kugler*, *supra*, 69 Cal.2d at p. 376; see *Birkenfeld*, *supra*, 17 Cal.3d at p. 169.) The Board and the UFW contend that the MMC statute's two-tiered system — administrative review by the Board, followed by judicial review by the Courts of Appeal — constitutes an adequate safeguard against "improper [collective bargaining agreement] terms or mediator misconduct." While conceding that judicial review can serve as a safeguard, Gerawan claims that the review contemplated by the MMC statute is "deferential in name, but illusory in fact." The Court of Appeal likewise determined that the Board review process requires

31

"virtually a rubberstamp approval to the mediator's reported [collective bargaining agreement] as long as the terms thereof have at least a small kernel of plausible support."

We agree with the Board and the UFW that the statute provides numerous procedural safeguards throughout the MMC process to protect the parties from arbitrary or unfair action. The parties at the very beginning must agree on a neutral mediator; if not, the mediator will be selected from the Board's list of nine mediators. (§ 1164, subd. (b).) A mediator who demonstrates "bias, prejudice, or interest in the outcome of the proceeding" shall be disqualified. (Cal. Code Regs., tit. 8, § 20404, subd. (a).) Either party may petition the Board to review the mediator's final report, and the Board must order the mediator to modify any provisions that are "unrelated to wages, hours, or other conditions of employment," "based on clearly erroneous findings of material fact," or "arbitrary or capricious in light of the mediator's findings of fact." (§ 1164.3, subd. (a); see *id.*, subd. (c).) Further, either party can petition for the Board to set aside the mediator's report and appoint a new mediator where it is established that the report was "procured by corruption, fraud, or other undue means," or where the party's rights were "substantially prejudiced by the misconduct of the mediator." (*Id.*, subd. (e).) If dissatisfied with the Board's decision, either party may then petition for judicial review. (§ 1164.5.) The court has the power to reverse the Board's order if it determines "on the basis of the entire record" that the Board acted in excess of its jurisdiction or not in the manner required by law, that the Board's order was "procured by fraud or was an abuse of discretion," or that the Board's order violated the petitioner's constitutional rights. (*Id.*, subd. (b).)

These safeguards are constitutionally adequate to protect parties and prevent misconduct, favoritism, or abuse of power by the mediator. Indeed, other courts have upheld the constitutionality of compulsory interest arbitration schemes

32

even where the statutes "expressly provided" that the arbitrator's determination "was final and unappealable." (*Mt. St. Mary's Hospital v. Catherwood* (1970) 26 N.Y.2d 493, 514 (conc. opn. of Fuld, C.J.), citing *City of Washington v. Police Dept. of City of Washington* (1969) 436 Pa. 168; *Fairview Hospital Ass'n v. Public Bldg. Service and Hospital and Institutional Emp. Union Local No. 113 A.F.L.* (1954) 241 Minn. 523.)  Moreover, this case itself shows that the review process is not a mere "rubberstamp."  Here the parties jointly selected a mediator, and the mediator conducted several on-the-record hearings before submitting a final report to the Board fixing the terms of the parties' collective bargaining agreement. After Gerawan objected to the terms of the final report, the Board remanded six disputed provisions to the mediator for further consideration.  The parties then resolved those contested terms with the mediator's assistance.  Gerawan might not agree with the outcome of the MMC process, but that does not mean it was denied "suitable safeguards" to protect it from any abuses of that process.  (*Wright*, *supra*, 30 Cal.3d at p. 712.)

Gerawan argues that the MMC statute's judicial review is additionally ineffective because a court would be unable "to assess whether ex parte or 'off-the-record' communications 'decisively influenced' the mediator's decisions." But as the Board explains, ALRB regulations require the mediator to cite evidence in the record to support his or her final report and prohibit the mediator from basing any findings or conclusions on "off the record" communications.  (Cal. Code Regs., tit. 8, § 20407, subd. (a)(2).)  Further, the regulations allow a party to file with the Board "declarations that describe pertinent events that took place off the record" in case of any alleged misconduct or improper factfinding.  (*Id.*, § 20408, subd. (a).)  Gerawan did not do so here.  The ALRB regulations provide additional safeguards against unfairness or favoritism.

In sum, the Legislature resolved the fundamental policy issues and provided sufficient guidance and procedural safeguards in the MMC statute. The MMC statute does not unconstitutionally delegate legislative authority.

**IV.**

We next consider whether agricultural employers may defend against a union's MMC request by showing that the union abandoned its status as bargaining representative. As noted, "[a]n agricultural employer or a labor organization *certified as the exclusive bargaining agent* of a bargaining unit of agricultural employees" may file a declaration with the Board requesting MMC. (§ 1164, subd. (a), italics added.) There is no dispute that Gerawan's employees elected the UFW as their certified representative in 1992 and that no subsequent valid election or decertification has taken place. But Gerawan contends, and the Court of Appeal agreed, that it is entitled to argue that the UFW forfeited its certification — and thus its ability to invoke the MMC process — because it had been absent from 1995 to 2012. Because the MMC statute relies entirely on the preexisting ALRA certification procedures, we first recount that statutory backdrop before addressing whether such a defense is available.

Section 1156 provides that "[r]epresentatives designated or selected by a secret ballot for the purposes of collective bargaining by the majority of the agricultural employees in the bargaining unit shall be the exclusive representatives of all the agricultural employees in such unit for the purpose of collective bargaining." (§ 1156.) Agricultural employers may not "refuse to bargain collectively in good faith with labor organizations certified" pursuant to section 1156. (§ 1153, subd. (e).) Further, under the ALRA, "unlike the NLRA, an exclusive bargaining representative may be designated only on the basis of a secret representation election, and not by the presentation of union authorization cards or any other less reliable method sanctioned under federal law." (*Highland Ranch v.*

34

*Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859.)  To that end, the ALRA makes it unlawful for an employer to "recognize, bargain with, or sign a collective-bargaining agreement with any labor organization not certified" through the procedure for a secret election.  (§ 1153, subd. (f).)

Soon after the ALRA's enactment, the Board considered whether an employer has a continuing duty to bargain with a union certified as the exclusive bargaining representative where an agreement has not been reached by the end of the initial year of certification.  (*Kaplan's Fruit & Produce Co. Inc.* (1977) 3 ALRB No. 28 (*Kaplan's Fruit*).)  The employers in that case had pointed to section 1155.2, which provides that if the Board finds that the employer had failed to bargain in good faith with the certified union, then the Board may "extend the certification for up to one additional year, effective immediately upon the expiration of the previous 12-month period following initial certification." (§ 1155.2, subd. (b).)  "[I]f 'certification' lapses after one year," the employers argued, their "duty to bargain [under section 1153, subd. (e)] must also lapse." (*Kaplan's Fruit*, at p. 2.)  The Board rejected that argument, relying on NLRB precedent holding that " 'a certified union, upon expiration of the first year following its certification, enjoys a rebuttable presumption that its majority representative status continues.' "  (*Ibid.*, quoting *Terrill Machine Co.* (1969) 173 NLRB 1480.)  Certification under the ALRA, the Board explained, creates a "duty to bargain" that has no time limit, as well as an "election bar," set out in section 1156.6.  (*Kaplan's Fruit*, at pp. 2–3.)  Section 1155.2's extension procedure concerns only the election bar, which seeks "to bind employees to their choice of bargaining agent for a period of time sufficient to allow the bargaining relationship to mature and bear fruit"; it does not concern the employer's duty to bargain. (*Kaplan's Fruit*, at p. 4.)

35

The Board also based its decision on the policies underlying the ALRA. Accepting the argument that an employer's bargaining obligation lapsed one year after certification would "in effect require annual elections at every organized ranch in the State." (*Kaplan's Fruit*, *supra*, 3 ALRB No. 28 at p. 2.) This would "strike at the Act's central purpose of bringing 'certainty and a sense of fairplay' " to agricultural relations by "inhibit[ing] good faith bargaining" and "promot[ing] strikes by placing the union under great time pressure to obtain an agreement before its certification lapses." (*Id.* at pp. 5–6.) The Board concluded that the Legislature could not have intended "to make the process of collective bargaining into a kind of sporting event in which the parties play against each other and against a clock at the same time." (*Id.* at pp. 6–7.) In *Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1 (*Montebello*), the court upheld the Board's interpretation that "the employer's duty to bargain . . . continues until such time as the union is officially decertified as the employee bargaining representative pursuant to the provisions of sections 1156.3 or 1156.7." (*Id.* at pp. 23–24.) This interpretation "appear[ed] to be true to the underlying purpose of the [ALRA] as a whole — to promote stability in the agricultural fields through collective bargaining." (*Id.* at p. 29.)

The Court of Appeal in *F & P Growers Assn. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667 (*F & P Growers*) considered a related question: whether an employer may refuse to bargain with a union representative when it reasonably believes that the union has lost the support of a majority of its employees. (*Id.* at pp. 670–671.) Agreeing with the Board, the court held that an employer could not raise a "good faith doubt of majority support" defense under the ALRA, even though NLRB precedent provided such a defense under the NLRA. (*Id.* at p. 678; see *Nish Noroian Farms* (1982) 8 ALRB No. 25.) In so holding, the court pointed to several critical differences between the ALRA and

36

NLRA. First, although the NLRA permits employers to "voluntarily recognize and bargain with a labor union that has demonstrated its majority status by means other than an election" (*F & P Growers*, *supra*, at p. 674, citing *NLRB v. Gissel Packing Co.* (1969) 395 U.S. 575), the ALRA specifically prohibits an employer from bargaining with a nonelected union (§ 1153, subd. (f)). Second, whereas the NLRA permits employers to petition to conduct an election for a representative, the ALRA allows only employees or labor unions to petition for an election. (Compare 29 U.S.C. § 159(c)(1)(B) with Lab. Code, § 1156.3.) Third, under the ALRA, only employees or labor organizations can move to decertify a union representative. (*F & P Growers*, at pp. 675–676, citing § 1156.7.)

These differences, the court explained, "show[ed] a purpose on the part of the Legislature to prohibit the employer from being an active participant in determining which union it shall bargain with in cases arising under the ALRA." (*F & P Growers*, *supra*, 168 Cal.App.3d at p. 676.) Permitting an employer to "rely on its good faith belief in order to avoid bargaining with an employee chosen agricultural union" would allow the employer to "do indirectly . . . what the Legislature has clearly shown it does not intend the employer to do directly." (*Id.* at pp. 676–677.) The court observed that unique features of "the California agricultural scene" — such as "rapid turnover" of agricultural workers, many of whom are temporary noncitizens who do not speak English — gave "all the more reason for the Legislature to decide to remove the employer from any peripheral participation in deciding whether to bargain with a particular union." (*Id.* at p. 677.) The "legislative policy" of the ALRA, the court concluded, is that "the unions [should] be chosen solely by the employees and not the employers." (*Id.* at p. 678.)

In accordance with this precedent, the Board has consistently determined that an employer may not refuse to bargain with a union on the ground that it has

37

"abandoned" its status as representative. (See *Dole Fresh Fruit Company*, *supra*, 22 ALRB No. 4; *Bruce Church, Inc.* (1991) 17 ALRB No. 1; *Lu-Ette Farms, Inc.* (1982) 8 ALRB No. 91.) Under these decisions, a union, once certified, remains the employees' exclusive bargaining representative until it is decertified or until the union is unwilling or unable to represent the bargaining unit. Following the MMC statute's enactment in 2003, the Board has continued to apply this "certified until decertified" rule in deciding that employers may not raise union abandonment as a defense to requests for MMC. (See *Gerawan Farming*, *supra*, 39 ALRB No. 5 at pp. 3–4; *San Joaquin Tomato Growers, Inc.*, *supra*, 37 ALRB No. 5 at pp. 3–4; *Pictsweet Mushroom Farms*, *supra*, 29 ALRB No. 3 at pp. 10–11.)

The Court of Appeal did not dispute the validity of the precedent above or the "well-settled rule" that "an employer must continue to bargain in good faith with the originally certified union." But it held that employers may raise an abandonment defense against a union's request for MMC because "the MMC process differs materially from bargaining and is largely a postbargaining process."

In evaluating this argument, we note that although "we take ultimate responsibility for the interpretation of a statute, we accord significant weight and respect to the longstanding construction of a law by the agency charged with its enforcement." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1082.) Here, the Board, as the agency charged with the ALRA's administration, "is entitled to deference when interpreting policy in its field of expertise." (*J. R. Norton*, *supra*, 26 Cal.3d at p. 29.) We must give significant weight to its determination that under the ALRA, employers may not invoke abandonment as a defense to the MMC process. (See *Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d

38

321, 325 ["[T]he administrative interpretation of a statute will be accorded great respect by the courts and will be followed if not clearly erroneous."].)

Moreover, "when the Legislature amends a statute, we presume it was fully aware of the prior judicial construction." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 572.) Likewise, " '[t]he Legislature is presumed to be aware of a long-standing administrative practice. . . . If the Legislature, as here, makes no substantial modifications to the [statute], there is a strong indication that the administrative practice [is] consistent with the legislative intent.' " (*Thornton v. Carlson* (1992) 4 Cal.App.4th 1249, 1257 (*Thornton*); see *In re Dannenberg*, *supra*, 34 Cal.4th at p. 1082; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 21 (conc. opn. of Mosk, J.).) At the time of the MMC statute's enactment, the Legislature was aware that both the Board and the courts had consistently affirmed the ALRA's "certified until decertified" rule. In adding the MMC provisions to the ALRA statutory scheme, the Legislature included no provisions concerning certification or abandonment; it merely provided that the labor union must be "certified as the exclusive bargaining agent," thus incorporating the existing ALRA certification procedures. (§ 1164, subd. (a).) The Legislature offered no indication that it intended the MMC statute to depart from more than two decades of precedent and provide employers with a novel abandonment defense.

As noted, the Board rejected the abandonment defense in MMC proceedings after the MMC statute's enactment in 2002. (*San Joaquin Tomato Growers, Inc.*, *supra*, 37 ALRB No. 5 at pp. 3–4; *Pictsweet Mushroom Farms*, *supra*, 29 ALRB No. 3 at pp. 10–11.) Yet in subsequent amendments to the MMC statute, the Legislature took no action to modify or overrule the Board's interpretation. (See Stats. 2003, ch. 870, § 1; Stats. 2011, ch. 697, § 4.) This provides additional evidence that the Board's construction of the MMC statute is

consistent with the Legislature's intent.  (See *Thornton*, *supra*, 4 Cal.App.4th at p. 1257.)

The Court of Appeal's contention that the MMC process falls "outside the ordinary bargaining context" lacks support in the MMC statute.  Rather, the text and structure of the statute indicate that the MMC process is a continuation of the ordinary bargaining process.  The Legislature enacted the MMC statute in order to "ensure a more effective *collective bargaining process* between agricultural employers and agricultural employees"  (Stats. 2002, ch. 1145, § 1, p. 7401, italics added), and the MMC process begins only after a union representative or an employer makes "a renewed demand *to bargain*" (§ 1164, subd. (a), italics added).  Moreover, the MMC statute requires that the parties, with the assistance of the mediator, conduct considerable negotiation before the interest arbitration phase.  (§ 1164, subd. (c).)  In many cases, the parties may reach a voluntary agreement on all or most of the disputed terms before the mediator writes a final report or before the ALRB issues its final order.

Further, compulsory interest arbitration is not wholly distinct from "normal" bargaining because it imposes contract terms on the parties.  The *availability* of interest arbitration, as an ultimate recourse, is itself a bargaining tool that the Legislature believed would facilitate resolution of disputes and consummation of first agreements.  (Stats. 2002, ch. 1145, § 1, p. 7401; Sen. Bill 1156 Analysis, *supra*, at p. 7.)  Other courts have similarly described interest arbitration "not as a substitute for collective bargaining, but as an instrument of the collective bargaining process." (*City of Bellevue v. International Assn. of Fire Fighters, Local 1604* (Wash. 1992) 831 P.2d 738, 742; see *Borough of Lewistown v. Pennsylvania Labor Relations Bd.* (Pa. 1999) 735 A.2d 1240, 1244 ["[T]he collective bargaining process under Act 111 includes binding interest arbitration where impasse is reached in negotiations."]; *Choctaw*, *supra*, 933 P.2d at p. 267

40

["This bargaining process now includes the right to binding mandatory interest arbitration . . . ."].)

Seizing on a single sentence in the Board's 1977 decision in *Kaplan's Fruit*, the Court of Appeal suggested that the "Board's own precedent reflects [that] any process by which the parties are *compelled* to *agree* to imposed terms . . . does not fit into the parameters of bargaining under the ALRA." But *Kaplan's Fruit* does not stand for that broad principle. In the course of holding that employers have a continuing duty to bargain with a union representative, the Board merely described the contemporary state of the law, which at that time did not provide for interest arbitration: "Nothing we declare in this opinion alters the statutory protection given to employers. Their duty to bargain, no matter how long its duration, does not compel them to agree to a proposal." (*Kaplan's Fruit*, *supra*, 3 ALRB No. 28 at p. 7.) When the Legislature later enacted the MMC statute, it expanded the "duty to bargain" to include the MMC process.

Finally, even if the MMC process "differs materially from bargaining," as the Court of Appeal found, neither Gerawan nor the Court of Appeal has identified any statutory language, legislative history, or other evidence suggesting that the Legislature intended "bargaining" to be treated differently from so-called "postbargaining." Whether abandonment should be recognized as a defense in the latter context but not the former is a question for the Legislature, not the courts.

Our conclusion is consistent with the purposes of the ALRA and the MMC statute. The ALRA created a state policy "to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing, . . . and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives." (§ 1140.2.) "[T]he Legislature's purpose in enacting the ALRA was to limit the employer's influence in determining whether

41

or not it shall bargain with a particular union . . . [and] remove the employer from any peripheral participation." (*F & P Growers*, *supra*, 168 Cal.App.3d at pp. 676–677.) Allowing an employer like Gerawan to avoid MMC by purporting to assert the interests of its employees in claiming that the union representative had abandoned its employees would permit the employer to "do indirectly . . . what the Legislature has clearly shown it does not intend the employer to do directly." (*Id.* at p. 677.)

Indeed, the very purpose of the MMC statute was to revive long-dormant relationships between agricultural employers and labor unions in order to facilitate the adoption of first collective bargaining agreements. The Legislature was troubled by employers' "continued refusal[s] . . . to come to the bargaining table once an election has occurred," which caused employees "to languish without the negotiated contracts they have elected to secure." (Sen. Bill 1156 Analysis, *supra*, at p. 7.) Thus, the MMC statute was enacted with an understanding that the MMC process would be available to unions that had long ago reached an impasse with employers and were unable to resume negotiations — in other words, unions that are likely to have less of a presence at the employer *precisely* because no collective bargaining agreement yet exists.

In the face of the strong legislative policy against employer participation in the union selection process, Gerawan argues that "the employer's ability to raise the abandonment defense [against the MMC statute] is . . . the only way to protect the workers' right to choose." The Court of Appeal similarly concluded that "employees' right to a representative of their own choosing would be seriously jeopardized in the situation of abandonment by a union where . . . the absentee union suddenly reappeared on the scene to demand the MMC process."

But the ALRA contains a comprehensive set of protections for employees who no longer wish to be represented by the certified labor union. The employees

42

or a rival labor union may petition for a new election to decertify or replace the existing union representative.  (§§ 1156.3, 1156.7.)  "So long as the employees can petition for a new election if they wish to remove the union, the employer has no real cause for concern about whether it is bargaining with the true representative of its employees."  (*Montebello*, *supra*, 119 Cal.App.3d at p. 28.)  Indeed, Gerawan's employees *did* file a petition to decertify the UFW.  Although the Board later set aside that decertification effort because it found that Gerawan "unlawfully inserted itself into the campaign" (*Gerawan Farming, Inc.* (2016) 42 ALRB No. 1, p. 8), the fact that the employees mounted such an effort demonstrates that employees have recourse beyond an employer's ability to raise an abandonment defense.

The Court of Appeal opined that the "rapid timeframe" of the MMC process would mean that decertification "would often be too late."  But the ALRA requires that the Board set an election within seven days from receiving a decertification petition.  (§ 1156.3, subd. (b).)  By contrast, a union representative generally may not request MMC until 90 days after its renewed demand to bargain, and even after that, the statute requires at least 30 days of mediation. (§ 1165, subds. (a), (c).)  Employees thus have a considerable amount of time in which to deliberate and organize for purposes of decertification.  In this case, for example, the UFW filed its renewed demand to bargain on October 12, 2012, and the mediator did not issue his final report until almost one year later, on September 28, 2013.  Moreover, an initial collective bargaining agreement does not last forever.  The contract imposed by the Board's final order here, for example, has a three-year term.  If the employees are dissatisfied with either the collective bargaining agreement or their union's representation, then they can petition to decertify the union in the third year of that term.  (§ 1156.7, subd. (c).)

An additional protection against unexplained union absences is that "a union disclaimer of interest or union defunctness" terminates the union's certification as bargaining representative. (*San Joaquin Tomato Growers, Inc.*, *supra*, 37 ALRB No. 5 at p. 3; *Pictsweet Mushroom Farms*, *supra*, 29 ALRB No. 3 at p. 6.) Thus, under the Board's precedent, employees are entitled to select a new union representative when its existing representative has suffered an "institutional death" and is therefore unable to represent the employees. (*Picstweet Mushroom Farms*, *supra*, 29 ALRB No. 3 at p. 6.*)

Finally, under the ALRA, an agricultural employer can file an unfair labor practice charge against a certified union representative who "refuse[s] to bargain collectively in good faith." (§ 1154, subd. (c).) In addition, the Board has held that the "[f]ailure of a union to respond within a reasonable time will constitute a waiver of the right to bargain over a proposed change in terms and conditions of employment." (*Dole Fresh Fruit Company*, *supra*, 22 ALRB No. 4 at p. 18.) An employer thus has multiple options to defend against "what may appear to be a derelict or defunct incumbent union." (*Id.* at p. 16.) What an employer cannot do under the ALRA is unilaterally declare that it will refuse to engage with the union because it believes the union has abandoned its employees. This is true whether in response to an initial demand to bargain, a renewed demand to bargain, or a request to refer the parties to MMC. In all cases, the ALRA reserves the power to select the union representative to the employees and labor organizations alone.

In sum, we hold that an employer may not defend against a union's MMC request by challenging the union's certification as bargaining representative on the basis of abandonment. The Board did not abuse its discretion when it declined to consider Gerawan's abandonment argument.

## CONCLUSION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with our opinion.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**KLINE, J.**[*]

---

[*]     Presiding Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Gerawan Farming, Inc. v. Agricultural Labor Relations Board
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 236 Cal.App.4th 1024
**Rehearing Granted**

_____

**Opinion No.** S227243
**Date Filed:** November 27, 2017
_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Michael P. Mallery; Irell & Manella, David A. Schwarz; Georgeson, Belardinelli and Noyes, Georgeson & Belardinelli, C. Russell Georgeson; Barsamian & Moody and Ronald H. Barsamian for Petitioner and for Plaintiff and Appellant.

Luke A. Wake; Damien M. Schiff; Benbrook Law Group, Bradley A. Benbrook, Stephen M. Duvernay; Walter & Wilhelm Law Group, Paul J. Bauer; McCormick, Barstow, Sheppard, Wayte & Carruth and Anthony Raimondo for National Federation of Independent Business Small Business Legal Center, Cato Institute, California Farm Bureau Federation, California Fresh Fruit Association, Western Growers Association and Ventura County Agricultural Association as Amici Curiae on behalf of Petitioner and for Plaintiff and Appellant.

Walter & Wilhelm Law Group, Paul J. Bauer; Raimondo & Associates, Anthony Raimondo, Gerardo V. Hernandez and Jasmine Shams for Silvia Lopez as Amicus Curiae on behalf of Petitioner and for Plaintiff and Appellant.

Carl G. Borden, Robert P. Roy, John C. Eastman, Anthony T. Caso and Jason E. Resnick for Western Growers Association, California Farm Bureau Federation, Agricultural Council of California, California Citrus Mutual, California Grape and Tree Fruit League, Grower-Shipper Association of Santa Barbara and San Luis Obispo Counties, Nisei Farmers League, and Ventura County Agricultural Association as Amici Curiae on behalf of Petitioner and for Plaintiff and Appellant.

Carl G. Borden for California Farm Bureau Federation as Amicus Curiae on behalf of Petitioner and for Plaintiff and Appellant.

Robert P. Roy for Ventura County Agricultural Association as Amicus Curiae on behalf of Petitioner and for Plaintiff and Appellant.

John C. Eastman and Anthony T. Caso for Center of Constitutional Jurisprudence as Amicus Curiae on behalf of Petitioner and for Plaintiff and Appellant.

**Counsel:**

Jason E. Resnick for Western Growers Association as Amicus Curiae on behalf of Petitioner and for Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Kathleen A. Kenealy, Chief Assistant Attorney General, Gregory D. Brown, Deputy State Solicitor General, Douglas J. Woods, Assistant Attorney General, Constance L. LeLouis, Mark R. Beckington and Benjamin M. Glickman, Deputy Attorneys General, for Defendant and Respondent.

Martínez Aguilasocho & Lynch, Mario Martínez, Thomas P. Lynch, Edgar I. Aguilasocho; Altshuler Berzon, Scott A. Kronland, Danielle Leonard and Jonathan Weissglass for Real Party in Interest and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David A. Schwarz
Irell & Manella
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276
(310) 277-1010

Benjamin M. Glickman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 210-6054

Mario Martínez
Martínez Aguilasocho & Lynch
P.O. Box 11208
Bakersfield, CA  93389
(661) 859-1174