Filed 5/20/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GHOST GOLF, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> GAVIN NEWSOM, as Governor, etc., et al., <br><br> Defendants and Respondents. | F085403 <br><br> (Super. Ct. No. 20CECG03170) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  D. Tyler Tharpe, Judge.

Pacific Legal Foundation and Luke A. Wake for Plaintiffs and Appellants.

NFIB Small Business Legal Center, Elizabeth Milito, Rob Smith; Benbrook Law Group, Bradley A. Benbrook and Stephen M. Duvernay, for National Federation of Independent Business Small Business Center as Amicus Curiae on behalf of Plaintiffs and Appellants.

Competitive Enterprise Institute, Dan Greenberg, Devin Watkins; Scharf Norton Center for Constitutional Litigation at the Goldwater Institute and Timothy Sandefur for Competitive Enterprise Institute and Goldwater Institute as Amici Curiae on behalf of Plaintiffs and Appellants.

Dhillon Law Group, Harmeet K. Dhillon and Krista L. Baughman for Association of American Physicians and Surgeons as Amicus Curiae for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, Paul Stein and Aaron Jones, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

In August 2020, Governor Gavin Newsom and the California Department of Public Health (CDPH) introduced the Blueprint for a Safer Economy, which implemented a color-coded, risk-based framework for tightening and loosening restrictions on activities during the COVID-19 pandemic. The Governor and CDPH issued the Blueprint under the authority granted to the Governor under the Emergency Services Act (Gov. Code, § 8550 et seq.)[1] (ESA) and the authority granted to CDPH under Health and Safety Code section 120140.[2] The Blueprint regime included restrictions on business activities, including customer capacity limitations.

Plaintiffs are Central California businesses and their owners. Ghost Golf, Inc. operates an indoor mini-golf course in Fresno County and Daryn Coleman is a shareholder.[3] Sol y Luna is a Mexican restaurant in Kern County owned by Nieves Rubio.

In October 2020, plaintiffs filed suit against the Governor and three other persons they claim were each responsible in some way for creating and enforcing the Blueprint. Plaintiffs alleged causes of action for declaratory and permanent injunctive relief, contending the Blueprint's creation and enforcement are unlawful. They alleged the Governor and CDPH lacked statutory authority to implement the Blueprint, and

---

[1] Undesignated statutory references are to the Government Code.

[2] Health and Safety Code section 120140 reads: "Upon being informed by a health officer of any contagious, infectious, or communicable disease the department may take measures as are necessary to ascertain the nature of the disease and prevent its spread. To that end, the department may, if it considers it proper, take possession or control of the body of any living person, or the corpse of any deceased person."

[3] The complaint identifies Coleman as the "owner" of Ghost Golf, Inc. We assume this means he is a shareholder, but we do not know if he is the only shareholder.

2.

alternatively, that broadly interpreting the ESA and Health and Safety Code section 120140 conferred unfettered discretion on defendants to impose restrictions on businesses, violating the California Constitution's non-delegation doctrine. Their complaint included a request for nominal damages. They claimed their businesses were put in jeopardy of permanently closing because the Blueprint's restrictions prevented them from operating at profitable levels.

Shortly after suing, plaintiffs moved for a preliminary injunction seeking to enjoin the enforcement of the Blueprint, which the trial court denied. Plaintiffs appealed from the order denying their motion. On June 11, 2021, after appellate briefing was completed, the Governor issued an executive order rescinding the Blueprint. In a written opinion, we dismissed the appeal as moot because we could no longer grant plaintiffs effective relief on their motion for a preliminary injunction. (*Ghost Golf, Inc. v. Newsom* 2021 WL 3483271, at p. 1 (*Ghost Golf I*).)

After *Ghost Golf I*, the parties cross-moved for summary judgment. The trial court granted defendants' motion and denied plaintiffs' motion, holding that the Third District Court of Appeal's decision in *Newsom v. Superior Court (Gallagher)* (2021) 63 Cal.App.5th 1099, review denied (Aug. 11, 2021) (*Gallagher*), had rejected the same challenges to the Governor's emergency powers that plaintiffs assert. Finding the Blueprint was authorized by the ESA, the trial court found it did not need to address whether the Health and Safety Code independently authorized CDPH to implement the Blueprint. The court entered judgment in defendants' favor.

Before any briefs on the merits were submitted, defendants moved to dismiss this appeal as moot because the Blueprint has been rescinded. Plaintiffs opposed the motion. We deferred ruling on the motion, and the parties went on to submit briefs. We deny defendants' motion to dismiss this appeal as moot but affirm the judgment. We follow *Gallagher* and conclude it governs the outcome of this appeal.

3.

## BACKGROUND

In *Ghost Golf I*, we set forth the background of the filing of this action: "In response to the COVID-19 pandemic, Governor Newsom declared a state of emergency in California on March 4, 2020. He then issued a general stay-at-home order on March 19, 2020, that indefinitely prohibited 'non-essential businesses' from operating. All non-essential businesses remained closed until May 4, 2020, when Governor Newsom issued Executive Order N-60-20, which allowed the State of California to begin reopening non-essential businesses in phases. Executive Order N-60-20 delegated authority to the California Public Health Officer 'to take any action she deems necessary to protect public health in the face of the threat posed by COVID-19.'"

"On July 1, 2020, Governor Newsom ordered many businesses, including dine-in restaurants and family entertainment centers, to cease indoor operations in counties on the 'State's County Monitoring List,' which then included Fresno and Kern Counties. On July 13, 2020, Governor Newsom required closure of indoor operations for dine-in restaurants and family entertainment centers statewide, and imposed restrictions on indoor operations for various other businesses in the counties on the State's County Monitoring List."

"On August 28, 2020, the Governor and [CDPH] announced they were replacing the County Monitoring List with the Blueprint. The Blueprint created a color-coded, tiered system that assigned each California county a color (purple, red, orange, or yellow) based on its assessed risk level for COVID-19 transmission and imposed corresponding restrictions for different sectors. The color-coding for each county was updated weekly."

"Under the Blueprint regime, indoor family entertainment centers were required to remain closed completely so long as a county was classified as either 'purple' or 'red.' They could operate at 25 percent capacity in counties in the 'orange' tier and 50 percent capacity in the 'yellow' tier."

4.

"Similarly, the Blueprint prohibited indoor dining in 'purple' counties and imposed restrictions on indoor operations in the other tiers. Restaurants in 'red' counties were limited to operating at 25 percent capacity and could not, under any condition, seat more than 100 people. Restaurants in 'orange' counties were prohibited from operating at more than 50 percent capacity and could not, under any condition, seat more than 200 people. Restaurants in 'yellow' counties were also limited to 50 percent capacity."

"On October 26, 2020, plaintiffs filed suit against defendants in Fresno County Superior Court. The complaint alleged the Governor and CDPH lacked the statutory authority to impose the type of business closure orders and other restrictions on indoor businesses derived from the Blueprint. The complaint further alleged, in the alternative, that broadly interpreting the Emergency Services Act (Gov. Code, § 8558 et seq.) and the relevant provisions of the Health and Safety Code as conferring unfettered discretion on defendants to impose restrictions on businesses would violate the California Constitution's non-delegation doctrine. The plaintiffs sought declaratory and permanent injunctive relief, as well as nominal damages."

"On November 12, 2020, plaintiffs filed a motion for preliminary injunction 'enjoining Defendants, their employees, agents, and persons acting on their behalf from enforcing Governor Newsom's Blueprint for a Safer Economy and other COVID-19 related emergency orders' against Plaintiffs' businesses. A hearing was held on December 16, 2020. On January 29, 2021, the trial court issued an order denying plaintiffs' motion, finding plaintiffs were unlikely to prevail on the merits of any of their causes of action and that the balance of equities did not favor an injunction."

"On February 4, 2021, plaintiffs filed a notice of appeal from the order denying their preliminary injunction."

"On June 11, 2021, after appellate briefing was completed, the Governor signed Executive Order N-07-21,2 which reads in part:

" 'IT IS HEREBY ORDERED THAT:

" '1) Executive Order N-33-20, issued on March 19, 2020, setting forth the Stay-at-Home Order is hereby rescinded.

" '2) Executive Order N-60-20, issued on May 4, 2020, directing the State Public Health Officer to issue a risk-based framework for reopening the economy, and all restrictions on businesses and activities deriving from that framework, including all aspects of the Blueprint for a Safer Economy, is hereby rescinded.' "

"We requested supplemental briefing from the parties on whether Executive Order N-07-21 mooted [that] appeal and, if so, whether [the] appeal should be dismissed.  Both parties submitted supplemental briefs.  Defendants argue [that] appeal [was] moot and should be dismissed.  Plaintiffs argue[d] [the] appeal [was] not moot, and alternatively contend[ed] there [were] good reasons for us to exercise our discretion to decide [the] appeal even were it moot."  (*Ghost Golf I, supra,* 2021 WL 3483271, at pp. 1–2.)

We concluded the appeal was moot and dismissed it.  "With the Blueprint rescinded, there [was] no longer anything to enjoin under plaintiffs' motion for a preliminary injunction, and therefore no practical, tangible relief we [could have] grant[ed] plaintiffs in the context of [that] appeal."  (*Ghost Golf I, supra,* 2021 WL 3483271, at p. 3.)

After our decision in *Ghost Golf I*, in July 2022 both parties moved for summary judgment.  The trial court granted defendants' motion and denied plaintiffs', ruling that "*Newsom v. Superior Court (Gallagher)* (2021) 63 Cal.App.5th 1099 rejected the same theories and contentions raised by plaintiffs," and thus *Gallagher* controls the outcome here.  Adhering to *Gallagher*, the trial court held that the ESA authorized the Governor to enact the Blueprint and that the ESA was not an unconstitutional delegation of legislative power to the Governor.  The trial court also stated that since the ESA itself authorized the Governor to enact the Blueprint, the court did not need to decide whether CDPH separately had authority to implement the Blueprint.

The court entered judgment in defendants' favor from which plaintiffs appeal.

6.

## DISCUSSION

Plaintiffs advance the same arguments on appeal as they did below and maintain that *Gallagher*'s reasoning was flawed. They first contend the ESA authorizes the Governor only to enforce existing laws, not to make new laws. Thus, the Governor had no power to enact the Blueprint on his own. In the alternative, plaintiffs contend that interpreting the ESA as delegating quasi-legislative authority to the Governor in an emergency would work an unconstitutional delegation of legislative power. We endorse *Gallagher*'s holdings and reject these arguments. In light of this conclusion, we need not determine whether the Health and Safety Code independently authorized CDPH to implement the Blueprint.

But before explaining *Gallagher*'s holding and its effect here, we will address defendants' motion to dismiss this appeal as moot, which was filed before briefing on the merits. Although this appeal is moot, it raises questions of broad public interest that are likely to recur, and we therefore deny defendants' motion.

## I. Relevant ESA provision

"The [ESA] endows the Governor with the power to declare a state of emergency 'in conditions of … extreme peril to life, property, and the resources of the state' so as to 'mitigate the effects of [the emergency]' in order to 'protect the health and safety and preserve the lives and property of the people of the state.' (Gov. Code, § 8550.) The Act confers upon the Governor broad powers to deal with such emergencies. (Gov. Code, § 8550.)" (*California Correctional Peace Officers Assn. v. Schwarzenegger* (2008) 163 Cal.App.4th 802, 811.)

The Governor may "proclaim a state of emergency in an area affected or likely to be affected" by a disease that causes "conditions of disaster or of extreme peril to the safety of persons[.]" (§§ 8625, 8558.) Section 8627, the statute the Governor relied on in implementing the Blueprint, reads: "During a state of emergency the Governor shall, to the extent he deems necessary, have complete authority over all agencies of the state

7.

government and the right to exercise within the area designated all police power vested in the state by the Constitution and laws of the State of California in order to effectuate the purposes of this chapter. In exercise thereof, he shall promulgate, issue, and enforce such orders and regulations as he deems necessary, in accordance with the provisions of Section 8567." Section 8567 provides: "The Governor may make, amend, and rescind orders and regulations necessary to carry out the provisions of this chapter. The orders and regulations shall have the force and effect of law." (§ 8567, subd. (a).) Orders and regulations issued during a state of emergency must be in writing, and they are effective immediately upon their issuance. (*Id.*, subd. (b).) When the state of emergency ends, the orders and regulations are of no further force or effect. (*Ibid.*)

The Governor must declare the end of the state of emergency "at the earliest possible date that conditions warrant." (§ 8629.) All of the Governor's powers under the ESA terminate when the state of emergency ends. (*Ibid.*) The Legislature may also terminate the state of emergency by concurrent resolution. (*Ibid.*)

## II.    Mootness

Defendants moved to dismiss this appeal, contending the rescission of the Blueprint renders plaintiffs' challenges to the Blueprint moot. They contend none of the exceptions to moot apply. While we agree the appeal is moot, we hold the public interest exception to mootness applies in this case.

Courts decide only justiciable issues. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573.) Justiciability means the questions litigated are based on an actual controversy. (*Ibid.*) Unripeness and mootness describe situations where there is no justiciable controversy. (*Ibid.*) Unripe cases are those in which an actual dispute or controversy has yet to emerge. (*Ibid.*) At the other end of the spectrum, mootness occurs when a once ripe actual controversy no longer exists due to a change in circumstances. (*Ibid.*)

"An appeal is moot if the appellate court cannot grant practical, effective relief."
(*Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340,
362.)  "The legal test for effective relief is whether there is a 'prospect of a remedy that
can have a practical, tangible impact on the parties' conduct or legal status.' " (*Delta
Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1053.)

" 'Repeal or modification of a statute under attack, or subsequent legislation, may
render moot the issues in a pending appeal.' " (*Jordan v. County of Los Angeles* (1968)
267 Cal.App.2d 794, 799.)  Where a party brings a challenge to the validity of a law,
repeal of that law before the appeal is concluded renders the appeal moot.  (See, e.g.,
*Howard Jarvis Taxpayers Assn. v. City of Los Angeles* (2000) 79 Cal.App.4th 242, 249
[taxpayer association's claim for injunctive and declaratory relief to prevent future
collection of registration fee for persons engaged in home occupations rendered moot by
city's revocation of fee requirement].)

Code of Civil Procedure section 1060 provides that "[a]ny person ... who desires a
declaration of his or her rights or duties with respect to another, ... may, in cases of actual
controversy relating to the legal rights and duties of the respective parties, bring an
original action or cross-complaint in the superior court for a declaration of his or her
rights and duties ...."  "Declaratory relief is appropriate where there is a justiciable
controversy, but not where the dispute is moot, or only hypothetical or academic." (*City
of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (2003) 113 Cal.App.4th
465, 481.)  When questions presented by an action for declaratory relief are, or have
become, moot, a court has no duty to proceed to determine rights and duties of the parties
and the action should be dismissed.  (*Pittenger v. Home Sav. & Loan Ass'n of Los
Angeles* (1958) 166 Cal.App.2d 32, 36.)

With the Blueprint rescinded, there is no longer anything to enjoin under
plaintiffs' request for a permanent injunction, and a judgment as to the Blueprint's
validity would have no effect.  It is therefore impossible for us to grant any effective

9.

relief.  Under these circumstances, the appeal, as well as the underlying action, are moot.  But that does not necessarily require this appeal to be dismissed.

True, moot appeals generally should be dismissed.  (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 77—78; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2023) ¶ 5:22 [the general rule is that moot appeals are dismissed].)  But there are three discretionary exceptions that allow an appellate court to decide an otherwise moot appeal:  "(1) when the case presents an issue of broad public interest that is likely to recur [citation]; (2) when there may be a recurrence of the controversy between the parties [citation]; and (3) when a material question remains for the court's determination [citation]."  (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479—480.)

We conclude the first exception applies here.  Defendants contend this exception does not apply because, even if this case presented a question of public interest, "the issues presented in this appeal could not reasonably be expected to recur because the conditions that led the State to adopt the Blueprint and related health orders no longer exist."  They assert that, in light of the development of COVID-19 vaccines and the end of the COVID-19 State of Emergency in early 2023, "there can be no reasonable expectation the State will re-impose the Blueprint."

We recognize that appellate courts are not inclined to invoke the public interest exception to address a moot appeal on its merits when the issues presented are essentially factual, requiring resolution case-by-case, and are unlikely to recur.  (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 867.)  However, the issues presented here are not "essentially factual."  Plaintiffs' action challenges both the scope and constitutionality of the Governor's emergency police power.  As to its scope, plaintiffs contend the ESA authorizes the Governor only to enforce existing laws, not to make new laws.  They base this argument on a narrow interpretation of the term "police power" as used in section 8627.  As to the ESA's constitutionality, plaintiffs

10.

contend an interpretation of the ESA as authorizing the Governor to "make law" would be an unconstitutional delegation of legislative power. Answering these questions does not require us to parse the Blueprint. The question of whether the ESA allows the Governor to "make law" in a state of emergency is an evergreen question that could arise in the context of any type of emergency. The same is true with whether the ESA unconstitutionally delegates legislative power to the Governor. Thus, were we to agree with plaintiffs on either the scope or constitutionality of the ESA, such a decision could foreseeably affect the Governor's exercise of authority in other types of emergencies, not just emergencies involving diseases. For these reasons, the precise questions plaintiffs raise could be raised in the context of any state of emergency where the Governor seeks to "make law" under the ESA. We therefore conclude that this case raises questions of broad public interest that are likely to recur.

We therefore address plaintiffs' arguments as to the ESA. But as we have mentioned, we will not need to address plaintiffs' arguments as to CDPH's separate authority to implement the Blueprint.

## III.   ESA's scope and constitutionality

We turn now to the merits of plaintiffs' appeal. *Gallagher, supra,* 63 Cal.App.5th 1099, controls our analysis. *Gallagher* involved a challenge to Governor Newsom's executive order requiring that all voters be provided a vote-by-mail ballot for the November 2020 election. (*Id.,* at p. 1106.) Two Assembly Members, James Gallagher and Kevin Kiley, challenged the order on the ground that it either exceeded the Governor's authority or, alternatively, that the authority delegated to the Governor violated the California Constitution. (*Ibid.*) The Sutter County Superior Court ruled that the Governor had exceeded his authority under the Act, declaring that the ESA "does not authorize the Governor to make or amend statutes." (*Id.* at p. 1108.) The court enjoined the Governor from issuing any executive orders that make or amend statutory law. (*Ibid.*)

11.

The Governor petitioned the Third District Court of Appeal for a writ of mandate challenging the superior court's ruling. (*Gallagher, supra,* 63 Cal.App.5th at pp. 1104–1105.) The Court of Appeal granted the Governor's petition and directed the superior court to dismiss as moot the Assembly Members' claim for declaratory relief that the executive order was void as an unconstitutional exercise of legislative power. (*Id.* at p. 1105.) But the court concluded the case presented matters of great public concern about the Governor's orders in the then-ongoing COVID-19 pandemic emergency and thus addressed the merits of the Governor's petition. (*Ibid.*)

As to the merits, the *Gallagher* court first held that the ESA permitted the Governor to amend or make new laws. The court explained that, by granting the Governor authority to exercise "all police power vested in the state," section 8627 of the ESA plainly authorizes the Governor to issue quasi-legislative orders because " 'police power' … is generally the power to legislate." (*Gallagher, supra,* 63 Cal.App.5th at p. 1113.)

As well, the court found no improper delegation of legislative power to the Governor. (*Gallagher, supra,* 63 Cal.App.5th at p. 1118.) The court observed that " ' "[a]n unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy." ' " (*Id.* at p. 1114.) As to sufficient guidance, the *Gallagher* court concluded that while the ESA does not impose any express standards on exercise of the emergency police power, the Act implied a requirement that the power be exercised to further the purpose of the ESA, which is to provide a coordinated response to emergencies (§ 8550). (*Id.* at pp. 1115–1116.) The court also found the ESA contained several safeguards on the exercise of the power, including that the Governor must terminate the state of emergency as soon as possible and that the Legislature may terminate the emergency by passing a concurrent resolution.

12.

Another safeguard is that any orders made under the ESA cease to have effect when the emergency is over.  (*Id.* at 1116–1118.)

*Gallagher* squarely addresses plaintiffs' contentions about the ESA's scope and constitutionality.  Plaintiffs do not persuade us not to follow *Gallagher* on both issues. We first address plaintiffs' arguments about the ESA's scope and then turn to their arguments about ESA's constitutionality.

Plaintiffs contend *Gallagher*'s interpretation that section 8627 delegates to the Governor the power to make law during a proclaimed emergency is flawed "because it contravenes the canons of construction."  Under their interpretation, section 8627 does not authorize the Governor to issue an executive order that makes statutory law.  Instead, "[s]ection 8627 merely confirms that the Governor has unified and direct control over the entirely of the Executive Branch during an emergency—in a way that he does not during ordinary times."  This competing interpretation is based in plaintiffs' contention that "there are two plausible interpretations of the term 'police power.'  The police power may refer to either the power to *make law* or the power to *enforce existing laws*.  *E.g., Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 836–841 (1987)[.]"  Plaintiffs' construction is the same construction the trial court employed in *Gallagher*.

Plaintiffs rely on the canon of constitutional doubt, which provides that " 'statutes are to be so construed, if their language permits, as to render them valid and constitutional rather than invalid and unconstitutional.' "  (*People v. Morera-Munoz* (2016) 5 Cal.App.5th 838, 846.)  But as the *Gallagher* court recognized, this principle applies only where a statute is ambiguous and susceptible to two different, but still plausible, interpretations.  (*Gallagher, supra,* 63 Cal.App.5th at pp. 1111–1112)

The *Gallagher* court also correctly observed that the term "police power" in section 8627 is not ambiguous.  (*Gallagher, supra,* 63 Cal.App.5th at p. 1113.) Section 8627 delegates to the Governor "*all* police power vested in the state by the Constitution and laws of the State of California …."  (Italics added.)  The "police power"

13.

is the general power of governing, possessed by the States but not by the Federal Government. (*National Federation of Independent Business v. Sebelius* (2012) 567 U.S. 519, 535–536; *Bond v. United States* (2014) 572 U.S. 844, 854.) As the *Gallagher* court put it, " 'police power' as exercised is generally the power to legislate." (*Gallagher,* at p. 1113.) It " ' "is the authority to enact laws to promote the public health, safety, morals, and general welfare." ' " (*Ibid.*) The phrase "all police power vested in the state by the Constitution and laws of the State of California" in section 8627 plainly includes the power to legislate—to make law. The statute is thus unambiguous. We endorse *Gallagher*'s holding that the ESA delegates quasi-legislative power to the Governor in an emergency.

We also endorse and follow *Gallagher*'s holding that section 8627 does not violate the constitutional separation of powers by delegating quasi-legislative power to the Governor in an emergency. In *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118 (*Gerawan*), the California Supreme Court said: " '[A]lthough it is charged with the formulation of policy,' the Legislature 'properly may delegate some quasi-legislative or rulemaking authority.' [Citation.] 'For the most part, delegation of quasi-legislative authority … is not considered an unconstitutional abdication of legislative power.' [Citation.] 'The doctrine prohibiting delegations of legislative power does not invalidate reasonable grants of power to an administrative agency, when suitable safeguards are established to guide the power's use and to protect against misuse.' [Citation.] Accordingly, '[a]n unconstitutional delegation of authority occurs only when a legislative body (1) leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction for the implementation of that policy.' " (*Id.* at pp. 1146–1147.)

The *Gallagher* court acknowledged this basic framework, and further recognized: " 'Only in the event of a total abdication of power, through failure either to render basic policy decisions or to assure that they are implemented as made, will [a] court intrude on

14.

legislative enactment because it is an "unlawful delegation" ' …." (*Gallagher*, *supra,* 63 Cal.App.5th at p. 1114, quoting *Kugler v. Yocum* (1968) 69 Cal.2d 371, 384.) "Thus, the Legislature does not unconstitutionally delegate legislative power when the statute provides standards to direct implementation of legislative policy." (*Gallagher,* at p. 1115; citing *Gerawan, supra,* 3 Cal.5th at p. 1148.)

Plaintiffs assert the ESA's "statutory text is devoid of any direction as to how the Governor should exercise his" emergency police power. The *Gallagher* court observed that section 8627 indeed does not set forth express standards, but it also recognized that " 'standards for administrative application of a statute need not be expressly set forth; they may be implied by statutory purpose.' " (*Gallagher, supra,* 63 Cal.App.5th at p. 1115, quoting *People v. Wright* (1982) 30 Cal.3d 705, 713.)

The *Gallagher* court then acknowledged that one of the ESA's primary purposes is to ensure that all the emergency services functions of the State and local governments, the federal government, and private agencies are coordinated "to the end that the most effective use be made of all manpower, resources, and facilities for dealing with any emergency that may occur." (§ 8550.) The court then noted that section 8569 charges the Governor with coordinating the emergency plans and programs of local agencies " 'with the State Emergency Plan and the plans and programs of the federal government and of other states to the fullest possible extent.' (Gov. Code, § 8569).)" (*Gallagher,* 63 Cal.App.5th at p. 1115.) The court concluded: "Thus, in issuing orders under section 8627, the Governor is charged by the Emergency Services Act with the responsibility to provide a coordinated response to the emergency. This statutory purpose while broad gives the Governor sufficient guidance, i.e., to issue orders that further a coordinated emergency response." (*Gallagher,* at pp. 1115–1116.)

The *Gallagher* court then explained that "of greater significance than 'standards' is the requirement that legislation provide 'safeguards' against the arbitrary exercise of quasi-legislative authority." (*Gallagher, supra,* 63 Cal.App.5th at p. 1116.) The court

15.

pointed to the "important safeguard" in section 8629 of the ESA. That section provides: "The Governor shall proclaim the termination of a state of emergency at the earliest possible date that conditions warrant. All of the powers granted the Governor by this chapter with respect to a state of emergency shall terminate when the state of emergency has been terminated by proclamation of the Governor or by concurrent resolution of the Legislature declaring it at an end." (§ 8629.) Another important safeguard the court noted is that " '[w]henever the state of war emergency or state of emergency has been terminated, the orders and regulations shall be of no further force or effect.' (§ 8567, subd. (b).)" (*Gallagher,* at p. 1116.) The court concluded these constituted adequate safeguards "for the delegation of quasi-legislative authority in section 8627." (*Id.,* at p. 1117.) We endorse this holding and concur that section 8627 is not unconstitutional.

In our view, the Legislature's power to end a state of emergency with a concurrent resolution is a very significant safeguard. (§ 8629.) The Legislature can exercise this power to end the state of emergency any time, even immediately after the Governor declares a state of emergency. (*Ibid.*) Thus, the Governor may exercise his emergency police powers for only as long as the Legislature allows him to. Plaintiffs argue this safeguard is weak because even if the Legislature votes to terminate a state of emergency, the Governor is free to issue a new emergency proclamation. It is true the Governor could immediately issue a new proclamation, but it is also true the Legislature could immediately counter with a new resolution to end the emergency. Another significant safeguard, not mentioned by the *Gallagher* court, is that the Governor's exercise of power under the ESA is subject to judicial review. (*California Correctional Peace Officers Assn. v. Schwarzenegger* (2008) 163 Cal.App.4th 802, 811–820 [reviewing whether emergency properly proclaimed].)

Plaintiffs, together with criticizing the ESA's lack of express standards and arguing that its safeguards are inadequate, also contend that the lower court here and the *Gallagher* court both failed to address whether the Legislature has resolved the

fundamental policy for the exercise of the Governor's emergency police power. We conclude the Legislature has resolved the fundamental policy. Section 8550 says that the state has a "responsibility to mitigate the effects of natural[…] emergencies that result in conditions of disaster or in extreme peril to life," "and generally to protect the health and safety and preserve the lives … of the people of the state." Section 8550 also states that, to ensure preparation for such emergencies, the state needed to "confer upon the Governor … the emergency powers provided" in the ESA. (*Id.*, subd. (a).) Thus, the Legislature has determined that the state has a responsibility to mitigate the harm caused by emergencies and that the Governor should lead this effort. This seems to us to be a fundamental policy resolution that satisfies what the non-delegation doctrine requires. (*Gerawan, supra,* 3 Cal.5th at pp. 1146–1147.)

Having concluded that the ESA authorizes the Blueprint, we need not determine whether the CDPH independently had the power to implement the Blueprint.

## DISPOSITION

Respondents' motion to dismiss the appeal is denied. The judgment is affirmed. Respondents are awarded their costs on appeal.


SNAUFFER, J.

WE CONCUR:


MEEHAN, Acting P. J.


DE SANTOS, J.

17.